Please call the next case. Our next case is 414-1075-WC. Prairie Material Sales v. Bradford Cray, Ralph Berkey for the appellant, and Bill Loeb for the appellate. Counsel, you may proceed. May it please the appellate court, Ms. Loeb, my name is Ralph Berkey. I represent Prairie Material Sales, the appellant. Today we bring you a question of law for which it is based on an undisputed fact. The fact is that Mr. Craig was in a physiotherapy session which had not yet begun, that he was sitting on an examination table, the therapist asked him to move his left leg for the purpose of making a comparative measurement. He was there for an injury to his right leg, but they wanted to take a comparative measurement on the left uninjured leg before, and I emphasize, before any physical manipulation or any testing of that uninjured leg had begun. The therapist asked Mr. Craig to prepare for the examination on the uninjured leg. In making an ordinary motion of life, his left knee became symptomatic from his underlying condition of rheumatoid arthritis. Okay, so nobody disputes that, but my question is, how does this case turn on a question of law? It is the application of the law to that fact. The commission found the case to be compensable. We believe they misapplied the law. How did they misapply the law? They hadn't yet read your decision in the case of Adcock. It's a neutral risk. That may very well be, but that's not a misapplication of law. That's against the manifest way of the evidence. It's not a question of law. It's a question of fact. Is the fact, is it causally connected to his underlying injury, i.e., was it caused by some, related to or caused by, some treatment that he was receiving for the initial injury? If the answer to that question is yes, then that particular case is compensable. If the answer is no, it's not compensable. But that's a factual question, not a legal question. The record is undeniable. The answer to that question would be no. There is no permissible basis for the commission to find the answer to that question to be yes. I direct, with respect, the commission, the court's attention to page 462 of the transcript where the petitioner says, nothing had begun. I was getting ready to be examined. Well, he wasn't at home. He was there at the therapist's office. This was part of the assessment of the patient to determine his range of motion, right? Yes. Okay. There's no doubt he was in the course of his employment. And he was doing this under the direction of the physical therapist. The physical therapist asked him to do something in preparation for administering physical therapy, correct? Yes. She asked him to make an ordinary motion of life. Okay. This ordinary motion of life is to sit on a table and bend one's knee to determine the extent to which it could be bent. Is that right? Yes. But it doesn't change the fact that the motion that created the condition of ill-being was an ordinary condition of life, regardless of how or why the petitioner made that motion. As I crossed Adams Street to come here today, I paused and looked both ways, just like my mother taught me. I looked both ways. Ordinary motion of life. If my neck condition would have manifested itself during that activity... Well, did you take that, turn your head to the extent that it could be turned? Absolutely. I had to look to the maximum range in each one. And if I had a condition of ill-being that became symptomatic during that motion, that would not be related to my employment. Counsel, what is your understanding of the but-for test that the Supreme Court talked about? You're talking about the Fermilab case where the... Or the International Harvester case. Yes. Both of them. The second injury was caused or created by the first injury. But for the first injury, the second event would not have happened. Right. So how do you score your theory with that law? Well, going back to my Adams Street example, I move my head left or right. Not compensable. But as I'm standing here today, I'm engaging the justices and moving my head in the same fashion. If my neck condition became symptomatic while I'm talking to you today, moving my head from left to right, that's simply not a compensable case. What happens if you were told to move your head left to right? Yeah. Because he was told to bend his left knee. As part of the treatment. Well, that doesn't change the fact that it's still an ordinary motion of life. What you're doing is you're saying that the employment has added something to an ordinary motion of life. It's what required... It's what necessitated the movement of the knee. Is there any evidence in the record... I mean, in this particular case, he's at the therapist because he has a work-related injury. No doubt. And he is in the course of his employment. But in the course it rolls out of. I mean, those are terms we use when the accident happens at work or something in that order. This is an injury that's sustained during the course of treatment for what is undeniably a work-related injury. Undeniably. So, and now, he injures his left knee because the therapist, who's going to treat him for his right knee problem, tells him, move your left knee so I can get a baseline test. He moves it and he's injured. So the question is, why doesn't it fall under international harvester? Well, it is understood that when someone is at a medical treatment facility for a work-related injury, that medical facility, in effect, becomes an extension of the employer's premises, putting him in the course of his employment. But forget about the course of... The rising out of is the beef. Well, your argument was, and you heard the earlier arguments, we had several cases today that talk about a neutral risk. An event of everyday life, as you have phrased it, of walking across the floor, in and of itself, is not compensable if somebody trips and falls. Okay? But, again, this person wasn't just an ordinary... He was, if you will, requested or directed as part of his treatment to engage in this everyday act of life, as you say, and then he got injured in the result of being directed to do that. Isn't that different about somebody voluntarily walking across the floor? Well, I... I was going to answer the question. You're going to answer the question? I was going to answer the question. Okay. Let's hear your answer. No, no. Go ahead. Well, the truth of the matter is I may prefer your question. No, it wasn't a question. It was an answer. Well, let's hear your answer. I answered that. Yeah. Isn't that fundamentally different than somebody being directed to do something in the course of treatment? I refer back to the last case that was argued where the question came up from Justice Hoffman. What was the something more? And the something more is something that is now being presented as under the direction of a physiotherapist. Right. Correct. That's the something more. What you might be saying, I think I hear you saying, is that just like on the floor of a factory, you are told to go from station A to station B, carry a projectile like in the last case. Right. But that's a neutral risk, walking. Right. And in this case, it's a neutral risk, what you mean. The neutral risk is a neutral risk regardless of how it is undertaken. So how do we square that with the international harvester? Well, I think I just did. The neutral risk, there must be some enhancement. The employment must offer some enhancement, like in the Fermilab case with the fellow on crutches after an accident. He's on a shopping trip with his wife while he's off of work, and the tip of the crutch encounters water and he slips and falls. The enhanced risk is the crutches. That's the something more. And there's no enhanced risk lying on your back and just flexing your left leg. Regardless of who asks you to do it. That's the respondent's position. So the neutral risk trumps the but-for test. Well, but-for is pretty dangerous because... Well, that's international harvester. Well, but how far do you extend the but-for? But-for the fact that Christopher Columbus discovered America. Certainly there would be some limitation. There is some line. We suggest that that line is not crossed on a simple move your left leg so I can do something to it, so I can measure it. I'm here on kind of a sentimental journey because I argued the Adcock case to you. You were responsible for Adcock, huh? Well, I had three helpers. In Adcock, I know I don't have to tell you this, but in your view, the expansive interpretation of the act departs from the precedence noted above and threatens to erode the distinction between arising out of and occurring in the course of the employment. Neutral risk is neutral risk. The proposition in Adcock by the dissenters was to weaken that. Adcock came out exactly the other way and said neutral risk still exists. Certainly some of us disagree. Well, because if neutral risk doesn't exist, then we are driven into positional risk. Then the location of an accident counts more than the analysis of looking to where the risk was that caused an injury. The location of the circumstances under which it occurs. Circumstances. It looks to causation, not merely location. In this case, the employment provided only two things. It provided the location for this man's ordinary activity of life, and it provided the occasion for it. But you just can't get around the international harvester and the buck-four test. I mean, if you take an example of a worker who is temporarily blinded because of a work-related accident and falls down steps because of his diminished vision, you can't say everybody walks down steps and therefore it's a neutral risk and therefore an uncompensable injury. International harvester would find that second injury to arise out of the first work accident. It would because the buck-four case in that situation is so plain. It's not an ordinary movement of life to be walking while you're blind. Can I ask a question? Yes, sir. This man had rheumatoid arthritis in his left knee, did he not? Globally, yes. All right. Now, if I have rheumatoid arthritis in my left knee and I'm asymptomatic and someone tells me, and in bending your left knee I become symptomatic, why isn't that compensable? Because moving of the left knee may very well be a neutral risk, but moving the left knee of a person who has rheumatoid arthritis may not be. It's no different than if you were to meet me on the corner of Adams and Capitol and say, How about what was your underlying condition? And did someone tell you to move your head? In this particular case, he was told to move his left knee. Yes. And there is evidence in the record that he had rheumatoid arthritis in the left knee. Yes. So now the question becomes, is telling someone with rheumatoid arthritis to move their left knee different than merely moving your left knee? We all respond to stimuli. It could have been his wife the morning before saying, step over here. It could have been. Okay. So the point is that the origin that stimulated the ordinary movement of life is immaterial. It's still an ordinary motion of life for which the risk remains in the petitioner. Now, the but-for test, of course, there are plenty of situations where we have to look at but-for. But-for the Fermi petitioner on crutches. But-for those crutches, he wouldn't have been injured. But-for the case of the man who is being examined on an x-ray machine, and the x-ray machine is over-energized, causing burns. But-for his original injury, he wouldn't have been on that table. He wouldn't have been subjected to the over-energized x-ray machine. But-for a man who has a broken leg and is being treated for it, or an injured leg being treated for it, and in the manipulation, the medical manipulation of it. So just taking that, if, in fact, the therapist, instead of telling the patient here, bend the knee, let's find out what the limit to your flexion is, if instead the therapist had a hand on the fellow's foot as he was doing this. It would be compensable. That's compensable. Because there's kinetic energy. A mere request is insufficient to overcome the ordinary activity. Or if the therapy grabbed the ankle and flexed the knee. If there was any intervention, actual kinetic energy. Has to have hands on in order for it to be compensable. The therapist has to actually apply her hands in order for it to be compensable. Because it's not an event of ordinary life. Moving your leg is. Right. Okay. I think I understand the argument. Do you have any other questions? I think-no, I don't believe there are. Thank you. You'll have time to reply. You may respond. May it please the court. I'm Sandra Loeb and I represent Brad Craig, the Pele. Doesn't his position have some intuitive appeal? Pardon me? Doesn't his position have some intuitive appeal? That just doing an event of ordinary life should not be compensable? Honestly, I don't think that that analysis should be introduced in the causation question. In Illinois, an employer is liable for all injuries traceable to a compensable accident. So I believe that the analysis of whether or not the employee faces a neutral risk that's greater than the general public should be confined to the accident. Hold on. I don't know that I buy that. You have a compensable accident. And as a result of the compensable accident, you have to go to physical therapy. You're not going to contend for us that merely because someone is walking down the street on the way to the physical therapy office and they're injured because they just walked that this is going to be compensable, are you? I agree with that because there would be an intervening cause that's wholly independent from- What's the intervening cause? The neutral risk of walking? His argument is that the flexing of one's knee is a neutral risk. There has to be some line- There has to be something different. I agree. Because you can make the argument, but for, he wouldn't have been walking down the street and going there in the first place if he hadn't been injured at work, right? Right. So how is it that this is, help us draw the line here and why is it that after the line is drawn, this falls on the side of a compensable injury? Because in this case, Mr. Craig testified that he was bending his knee because the therapist wanted to take a baseline measurement of his flexibility. So the difference is the therapist told him to bend his knee? Told him to bend his knee so that she could measure how far he could bend his knee. From that testimony, the commission could infer that he bent his knee beyond what he normally would do in daily life. I don't lie on my back and bend my knee up as far as I can unless there's some reason for me to do it. I don't do that in daily life. So this was unusual because to what you would say, what about an employer who says, can you go across the room and take that book off the shelf? Under certain arguments, I suppose you could say, well, he wouldn't have done that. This is under the direction of the employer, so therefore that trumps the act of walking. So it's hard to draw a line here, isn't it? Well, counsel, the opposing counsel indicated that if the therapist actually had her hands on Clayman and helped manipulate the knee, that that would bring it within the realm of compensability. But let's take an intermediate scenario where the therapy sessions have begun. They're in the therapy room and she directs the Clayman to stand up straight and bend down, touch his toes or do something without physically putting hands on, but actually directing Clayman to do something during the course of an actual physical therapy session. And it would seem that this would bring it more closely within the international harvester realm where that's in the course of medical treatment where the injury has occurred. It's not much different than what we have here, actually, but it would seem, you know, maybe the opposing counsel would indicate that that would bring it within the realm of compensability if it's being done during the course of an actual physical therapy session. Is there a qualitative distinction between that hypothetical scenario and here where physical therapy actually hasn't begun but it's a prelude to it? I think physical therapy has begun. He's meeting with the therapist and she's telling him, I need to know what your normal flexibility is before I can start exercising you. In the justice's example, what you have is, to simplify it, you have an examination versus an actual therapy. And so you're saying the examination is what you have here, but for this accident he would not be being examined. Absolutely. And it's also a diagnostic test in its own way. She's holding a protractor next to him as a measure. So your argument is it would be no different than the opposing counsel's example of an over-energized radiographic study, right? Absolutely. Absolutely. Medicine is different than it was when that case was decided. Hopefully we don't have a risk of getting burned by the x-ray machine. The thought occurs that the injury occurred within the course of the prescribed therapy. He has this argument about a kinetic energy factor here that takes it out of that. But I'm thinking of distinguishing the example of walking down the street. You're not walking down the street at the direction of a physical therapist when you go to the building. However, when you're in the room, the closed room with the therapist, it seems to me whether or not they put their hands on you with this kinetic energy possibility would be a nice distinction. If you're responding to the direction of the therapist, whether the hands are on you or not, that's a prescribed course of treatment. That's not a part of everyday life because you're not having prescribed treatment everyday life. Absolutely. As I think this thing through, I don't know that I buy the kinetic energy theory here. Well, and we're bound by international harvester, and the test is a but-for test. Absolutely. And but-for the original injury, he wouldn't have been there with the physical therapist telling him to bend his knee as far as he could or whatever. And there's sufficient evidence in the record for the commission to make that determination. So if you're just sitting there and the therapist comes in the room and says, can you point to that spot on the wall, and he raises his arm, I mean he's there for an injured right knee, and points to that spot on the wall, and his wrist snaps, then that's an injury. Perhaps we need to show that that was part of his therapy. Perhaps we need to show that that was part of his treatment to establish the causal relationship between pointing to the spot on the wall and the accident that brought you to therapy in the first place. Well, what if you have testimony that says the therapist is examining your willingness and ability to follow orders? Would that make it better for you? I think it needs to be treatment that... Well, you see the difficulty here. Yeah, I do. But we've seen cases, at least at the commission level, where someone goes to therapy and the first thing they do is they are asked to ride an exercise bike for five minutes to get their cardiovascular system working. If they are injured on the exercise bike, I don't think we'd be here arguing the same points. I think that would be part of his therapy. They would say it's part of a therapeutic exercise that is causally related to... Yeah, but we don't have that. I mean, that is rather not, I think the opposing counsel would say, an ordinary motion of everyday life. I mean, there are people who have a theory that, you know, cardiovascular exercise is harmful. And people don't like to do that. But for the fact the person is in therapy, they would not have been riding that bicycle at that time. I think that's clear. Yeah. It would be raising their heart rate, exposing themselves to heart injury. Or even leg injury if they weren't there for their leg. They'd still put you on a bike. Flexing the leg is not the same as riding a bicycle, is it? Ordinary activity? Don't we all flex our legs? Not on our back in order to measure the range, the flexibility of your leg. There's one point I do want to raise before I leave here. I don't think it was made clearly in the brief that this decision came out on a 19B decision. So I'm not just asking for the commission's decision to be affirmed. It needs to be remanded for further determination of TTD and additional medical and permanency, if any. Are there any further questions? Thank you. Thank you. I don't believe there are. Thank you, counsel. Thank you. Counsel, you may reply. The proposition is that a therapist giving orders to someone to prepare for an evaluation is the something more in the neutral risk. Our position is that until the exertion, be it kinetic energy or, for that matter, ordering someone to bend over and touch their toes, it doesn't have to be hands-on. If a person came in with a back injury and the therapist said, without touching them, bend over and touch your toes, and he went to an person giving the order, that's a compensable case. But it's not compensable until the physical exertion called for by the physiotherapist exceeds ordinary motion of life. In bending and touching one's toes, that's not something that we do each and every day. That's not an ordinary activity of life. Well, what about flexing one's knees to its limit? No evidence in the record whatsoever to the limit. Well, it's range of motion. It was never being tested. It was, please get in position to test. Well, I'm not sure about that. Clayman's testimony was the therapist asked him to bend his left knee to take a baseline measurement. So are we not to infer from that that that's when the injury occurred is when he flexed it to its limit? I mean, he was doing what she was asking him to do, which was to test the range of motion, and range of motion involves, I mean, we all know what range of motion is. She asked him to get ready for a test. Get ready for it. Please get in position. I'm reading from your statement of facts, okay? Quote, at the therapist's request, he bent his uninjured left leg, but then felt a pop in it and experienced pain in its front and outside aspects. I respectfully direct the court to page volume four of the record, page 462, which is explanatory. That's the page that you cite with that statement of facts. I suggest that we delve back into that and see what the exact wording was. I believe that it may be unclear from the briefs, but it is in preparation for an examination. Let me ask you this about this theory. Isn't there a well-established body of law that the employer takes the employee as they find them? No doubt. So what about if the employee has some underlying infirmity that predisposes them to get injured doing this normal activity of daily life you have alluded to? The preexisting condition. So how does that affect? So maybe just the act of flexing it caused the problem because of the predisposition in this person's internal system. So why isn't that compensable when you're doing it at the direction of the therapist? The Illinois Bell phone case of years ago where the petitioner had a knee that was so severe that any exertion was overexertion. And, counsel, just at page 463 the question was asked, and it was when you bent your knee that you felt the pop. Answer, uh-huh, and pain. Right. But go back to the bottom of 462, and does he not talk about getting ready for his exam? He had to bend his knee to get in position for the exam. I've read to you affirmative evidence that he bent his knee. There's no doubt he bent his knee. The question was, was the bending of the knee an ordinary activity of life in preparation for what may have been an actual test by the physiotherapist? Well, is bending the knee not part of the test because the knee has to be bent to make a measurement? She was asking him to get into position so that she could perform the examination. She's sitting there with the protractor to measure it. Right. She was getting ready, and so was he. But the test had not yet begun. There's no evidence of exertion beyond ordinary activity of life. Okay. I understand the position. Thank you. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement, and a written disposition shall issue.